**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Jason A. Czekalski

      v.                              Case No. 18-cv-592-PB
                                          Opinion No. 2020 DNH 212

Helen Hanks, New Hampshire Department
of Corrections Commissioner; and James
Daly, New Hampshire State Prison Chaplain


## O R D E R

Before the court is the defendants' motion for summary
judgment (Doc. No. 81).  In that motion, the defendants, New
Hampshire Department of Corrections ("DOC") Commissioner Helen
Hanks and New Hampshire State Prison ("NHSP") Chaplain James
Daly, seek a ruling in their favor on the claims remaining in
this case.  Also before the court are plaintiff Jason A.
Czekalski's two cross-motions for partial summary judgment (Doc.
Nos. 68, 69) on his Religious Land Use and Institutionalized
Persons Act ("RLUIPA") claims.


## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record reveals "no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir.
2016).  In this context, a "material fact" is one that has the

"'potential to affect the outcome of the suit.'"  <u>Cherkaoui v.
City of Quincy</u>, 877 F.3d 14, 23 (1st Cir. 2017) (citation
omitted).  A "'genuine dispute'" exists if a jury could resolve
the disputed fact in the nonmovant's favor.  <u>Ellis v. Fid. Mgmt.
Tr. Co.</u>, 883 F.3d 1, 7 (1st Cir. 2018) (citation omitted).  In
considering the evidence presented by either party, all
reasonable inferences are to be drawn in the nonmoving party's
favor.  <u>See</u> <u>Theriault v. Genesis HealthCare LLC</u>, 890 F.3d 342,
348 (1st Cir. 2018).

 "The party moving for summary judgment bears the initial
burden of showing that no genuine issue of material fact
exists."  <u>Feliciano-Muñoz v. Rebarber-Ocasio</u>, 970 F.3d 53, 62
(1st Cir. 2020).  As to issues on which the party opposing
summary judgment would bear the burden of proof, the movant need
only point out that there is an absence of evidence to support
the nonmoving party's case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S.
317, 325 (1986).  Then, the non-movant must point to definite
and competent evidence showing the existence of a genuine issue
of material fact and may not rely on the absence of evidence or
unsupported legal arguments.  <u>Irobe v. U.S. Dep't of Agric.</u>, 890
F.3d 371, 380 n.4 (1st Cir. 2018); <u>Perez v. Lorraine Enters.</u>,
769 F.3d 23, 29–30 (1st Cir. 2014); <u>see also</u> <u>Theidon v. Harvard
Univ.</u>, 948 F.3d 477, 494 (1st Cir. 2020) (non-movant "cannot
rely on 'conclusory allegations, improbable inferences,

acrimonious invective, or rank speculation'" (citation
omitted)).  "Speculation about mere possibilities, without more,
is not enough to stave off summary judgment."  Tobin v. Fed.
Express Corp., 775 F.3d 448, 452 (1st Cir. 2014).

If the party moving for summary judgment bears the burden
of proof on an issue, that party "must provide evidence
sufficient for the court to hold that no reasonable trier of
fact could find other than in its favor."  Am. Steel Erectors,
Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural,
Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir.
2008).  Then, "the burden shifts to the nonmovant to establish
that a genuine material dispute exists."  Harley-Davidson Credit
Corp. v. Galvin, 807 F.3d 407, 411 (1st Cir. 2015).  "At the
summary judgment stage, the absence of evidence on an issue
redounds to the detriment of the party who bears the burden of
proof on that issue."  Perez, 769 F.3d at 30.

## II.  BACKGROUND

### A.  Parties

Czekalski is an inmate at the NHSP who was brought up in a
Protestant family, was married to a Catholic woman for about
thirty years, and then converted to Judaism approximately twenty
years ago.  His practices at the NHSP have tended to be aligned
with Modern Orthodox Jewish practices.  See Dep. of Jason

Czekalski, Oct. 16, 2019 ("2019 Czekalski Dep.") at 25-26, 34
(Doc. No. 85-3, at 66-67, 69); Personal Decl. of Jason A.
Czekalski, Nov. 7, 2019 ("Czekalski Decl. I") (Doc. No. 68-1, at
5-6).

Defendant Chaplain Daly, a Roman Catholic deacon, has been
the NHSP Chaplain for more than fifteen years.  See Decl. of
James P. Daly, Sept. 5, 2018 ("Daly Decl. I") (Doc. No. 12-1, at
1).  Defendant Helen Hanks is the DOC Commissioner.


B.   Pertinent DOC Policies Regarding Religious Activities

DOC administrative rules provide that "[r]eligious
programs, individual religious counseling, or both" shall be
offered to all inmates, as appropriate to their custody level
and housing unit.  N.H. Admin. R. COR 302.06(a)-(b).  The rules
further provide that the DOC "shall encourage religious
volunteers to provide religious ministrations" to inmates in DOC
facilities.  Id.

The facility chaplain is the designated point of contact
for religious activities conducted by outside religious visitors
and volunteers at each DOC facility.  See Decl. of James P.
Daly, Feb. 11, 2020 ("Daly Decl. II") (Doc. No. 81-5, at 2); see
also DOC Policy and Procedure Directive ("PPD") 7.17 ¶¶ II-V
(Doc. No. 12-2).  All religious activities, defined as those
activities "designed specifically for worship, instruction,

spiritual guidance or counseling" in DOC facilities, are
conducted by or under the auspices of the facility chaplain.
PPD 7.17 ¶ III(A) (Doc. No. 12-2)

The chaplain's duties include pastoral counseling,
assisting inmates with obtaining religious items and
publications, serving as the librarian for religious materials
in the facility's Chapel library, screening religious materials
dropped off by religious volunteers/visitors, scheduling
congregate rites or rituals if an approved volunteer is
available, and leading rites and rituals when qualified to do
so.  See Daly Decl. II, Doc. No. 81-5, at 2, 5; PPD 7.17
¶¶ V(B), V(C)(3), V(G)(1)-(2), V(I) (Doc. No. 12-2); PPD 7.09
¶ IV(N)(1)(c)(4) (Doc. No. 12-3); see also PPD
305(d)(14)(1)(c)(4) (eff. Feb. 21, 2020).[1]

Clergy seeking to meet with DOC inmates can choose to
register either as a religious visitor, or as a religious
volunteer.  As a general rule, a person is not allowed to
register in both capacities.  See DOC Official Visitor
Registration Form (Doc. No. 11-3, at 19).  That is, a religious

---

[1]PPD 305 superseded PPD 7.09 in February 2020.  See DOC
Admin. Rules and Dep't Policies, Visiting Policy, available at
https://www.nh.gov/nhdoc/policies/documents/305-visiting-
policy.pdf (last accessed Dec. 8, 2020).  The pertinent parts of
PPD 7.09 cited in this Order also appear in PPD 305.  In this
Order, I generally refer to the provisions as they were numbered
in PPD 7.09.

visitor who is permitted to provide "individual religious ministrations" at the NHSP would not also generally be allowed to lead "congregate religious activities" as an approved religious volunteer in the same facility.  See PPD 7.17 ¶ IV(A)(3) (Doc. No. 11-2, at 24); see also DOC Official Visitor Registration Form (Doc. No. 11-3, at 19).

To become an approved religious volunteer, a person must: be properly credentialed and vetted, attend DOC training and orientation, and agree to comply with the same rules that apply to paid staff relating to inmate interactions.  See PPD 2.24 ¶ IV(A)(4)(h) (Doc. No. 11-6); PPD 7.17 ¶¶ IV(H), V(C) (Doc. No. 11-2).  Once approved, religious volunteers are allowed to meet with groups of inmates for instruction or other group activities in the chapel.  All inmates in the general prison population are free to attend such activities.  See PPD 7.17 ¶ V(C) (Doc. No. 11-2).  DOC policies require that approved religious volunteers maintain a clinical/professional distance from inmates, PPD 2.24 ¶ III(D)(9)(c) (Doc. No. 12-6, at 2), and specifically prohibit volunteers from "conduct[ing] business of any type for/with inmates," and from becoming overly familiar with inmates, PPD 7.17 ¶ IV(H) (Doc. No. 11-2, at 3).  Such restrictions, aimed at deterring undue familiarity between inmates and volunteers or paid staff, advance the DOC's legitimate interest in maintaining institutional security.  Nov. 16, 2018 Stip. of Undisputed Facts

in Connection with Hr'g on Req. for Prelim. Inj. ("Stip. I")
¶ 10 (Doc. No. 31, at 4).

Clergy who seek to be certified as "religious visitors" may
attend, but are not required to complete, the same training and
orientation required of religious volunteers.  See PPD 2.24
¶ IV(C)(1)(a) (Doc. No. 12-6, at 2).  Religious visitors are
allowed to provide individual counseling or instruction to
specific inmates, one-on-one, in the NHSP Visiting Room, but
they may not lead group activities in the chapel.  See id.; PPD
7.17 ¶ V(C) (Doc. No. 11-2); DOC Official Visitor Registration
Form (Doc. No. 11-3, at 19).

DOC policies that apply to religious visitors and
volunteers impose restrictions on corresponding with, and
providing to or receiving items from, inmates.[2]  It is undisputed
here, however, that religious visitors may receive calls from
inmates; correspond with inmates by letter (subject to a 10-page
limit); order books for direct mail to the inmate from the
publisher; and arrange for certain other non-contraband items to
be delivered to an inmate, including religious foods like
challah and matzah.  See Stip. I ¶ 6 (Doc. No. 31, at 3); Defs.'

---

[2]See PPD 2.24 ¶ IV(D)(9)(g), IV(D)(12)-(13) (Doc. No. 11-6,
at 4-5); see also PPD 2.24 ¶¶ IV(A)(3)-(4), IV(C)(1)-(2) (Doc.
No. 11-6, at 2-3).

Mot. for Summ. J. ¶ 17 (Doc. No. 81, at 7); Daly Decl. I (Doc. No. 12-1, at 6); 2019 Czekalski Dep. at 162-66 (Doc. No. 85-4, at 21-22).

DOC policies in effect since June 1, 2017 specifically prohibit religious visitors and volunteers from bringing any religious materials with them into the facility.  See PPD 7.09 ¶ IV(N)(1)(c)(4) (eff. June 1, 2017) (Doc. No. 11-3, at 7); see also PPD 2.24 ¶ IV(D)(14)(c)(9) (Doc. No. 12-6, at 2).  If they want to use religious materials during their meetings at the NHSP, religious visitors and volunteers must donate those materials to the facility ahead of time.  DOC policies designate the chaplain as the person who must receive, pre-screen, and decide whether to make those materials available for use during a visit.  PPD 7.09 ¶ IV(N)(1)(c)(4) (Doc. No. 11-3, at 7).

C.   Rabbi Nafshi and Meetings with Jewish Inmates

Two volunteers have regularly visited the NHSP to meet with Jewish inmates.  One such volunteer, not a rabbi, leads a weekly Hebrew study group, as well as twice-monthly Shabbat services which Czekalski attends.  See Stip. I ¶¶ 13-16 (Doc. No. 31, at 5).  The other is Rabbi Robin Nafshi, a Jewish rabbi who has met with inmates individually and in small groups at the NHSP for a number of years.  See Dep. of Rabbi Robin Nafshi, Dec. 20, 2019, at 11-13 (Doc. No. 85-4, at 40) ("Rabbi Nafshi Dep.").

Rabbi Nafshi became Czekalski's rabbi after he arrived at
the NHSP in 2013; he began interacting with her in spring 2014.
Personal Decl. of Jason A. Czekalski, Nov. 25, 2019, ("Czekalski
Decl. II") (Doc. No. 69-1, at 1).  Until June 1, 2018, Rabbi
Nafshi visited the NHSP about once per month to meet with one or
two inmates at a time, in the relative privacy of the NHSP
chapel, in her capacity as an approved "religious volunteer."
Inmates Seth Bader and Czekalski generally attended those
meetings together when they were both housed at the NHSP.  See
Rabbi Nafshi Dep. at 13-14, 27 (Doc. No. 85-4, at 40-41, 44).
On some occasions, Bader would send a letter to Rabbi Nafshi
ahead of time, asking her questions that they would then discuss
in their meetings, using written materials she would print out
and bring in to share with them.  Third Decl. of Seth Bader,
Nov. 20, 2018, ¶ 8 (Doc. No. 68-2, at 12-13) ("Third Bader
Decl.").  Occasionally, she donated books to the Chapel library.
See Third Bader Decl. ¶ 8 (Doc. No. 68-2, at 12-13).  The
inmates' meetings with Rabbi Nafshi typically occurred on
Mondays, Chaplain Daly's day off.  2019 Czekalski Dep. at 128
(Doc. No. 85-4, at 12)

For a number of years prior to 2018, Rabbi Nafshi had been
allowed to bring written materials with her to the meetings with
inmates in the Chapel, without incident.  See Rabbi Nafshi Dep.
at 24 (Doc. No. 85-4, at 43).  More recently, however, Rabbi

Nafshi found out she needed to drop off written materials in advance for pre-screening by the Chaplain.  See Rabbi Nafshi Dep. at 24, 44-46 (Doc. No. 85-4, at 43, 48-49); see also Daly Decl. II ¶ 9 (Doc. No. 81-5, at 9).  On April 21, 2017, Chaplain Daly sent Rabbi Nafshi an email stating that she needed to drop off written materials in the NHSP mailroom if she wanted to share those materials with inmates, and that he would bring those materials to the Chapel after reviewing them, and that the inmates could not receive more than ten double-sided pages.  See Rabbi Nafshi Dep. at 44-46 (Doc. No. 85-4, at 48-49); Daly Decl. II ¶ 9 (Doc. No. 81-5, at 9).

Rabbi Nafshi dropped off written materials in advance of her scheduled visits only twice in 2017/2018, once in March and once in May.  See Rabbi Nafshi Dep. at 23-25 (Doc. No. 85-4, at 43).  The March packet was available when she needed it, but the May 2018 packet, comprised of 67 double-sided pages of materials, was not.  See Rabbi Nafshi Dep. at 23-25 (Doc. No. 85-4, at 43); Daly Decl. II ¶ 10 (Doc. No. 81-5, at 3).

Rabbi Nafshi sent a follow-up email to Chaplain Daly in May 2018 to ask if there had been a problem with the packet she had planned to use that month.  Rabbi Nafshi Dep. at 22, 24-25 (Doc. No. 85-4, at 43).  Chaplain Daly's emailed response reached her several weeks later on June 1, 2018.  That email said that she had dropped off too many pages (67 double-sided pages, exceeding

the 10-page limit), that an inmate seeking to circumvent the 10-page limit on incoming mail had taken advantage of her, and that Chaplain Daly could not understand the relevance of her materials to inmate spiritual care.  See Rabbi Nafshi Dep. at 22, 46-47 (Doc. No. 85-4, at 43, 49); see also Daly Decl. II ¶ 10 (Doc. No. 81-5, at 3).  Chaplain Daly has explained that he inquired into the connection between the content of her materials and "her charge" as a "clergyman" in light of the extraordinary volume of material she presented and its burden on labor-intensive security-screening functions.  See Daly Decl. II ¶ 12 (Doc. No. 81-5, at 3).

Rabbi Nafshi testified that she was offended or frustrated by the tone of Chaplain Daly's June 1 email, by his slow responses to her emails and inquiries that could take weeks and weeks to get an answer, and by what she perceived to be his lack of an understanding of and interest in Judaism and how a rabbi could meet the spiritual needs of Jews in prison.  See Rabbi Nafshi Dep. at 21-27 (Doc. No. 85-4, at 42-44).  Rabbi Nafshi sent an email back to Chaplain Daly the same day, saying she would not be visiting Czekalski and Bader again in the foreseeable future.  See Daly Decl. II ¶ 13 (Doc. No. 81-5, at 4).  Czekalski filed this lawsuit within a month of Rabbi Nafshi's June 1 decision to stop her NHSP visits.  See Compl. (Doc. No. 1) (docketed June 28, 2018).

Several months after this lawsuit was filed, defendants'
counsel asked Rabbi Nafshi if she would consider resuming her
visits in a new capacity, as a "religious visitor."  See Rabbi
Nafshi Dep. at 13 (Doc. No. 85-4, at 40).  Rabbi Nafshi agreed.
Id.  In November 2018, as part of a negotiated resolution of
plaintiff's request for a preliminary injunction, Commissioner
Hanks consented to allow Rabbi Nafshi to be redesignated as a
religious visitor at the NHSP under the DOC rules, although she
retains the status of a religious volunteer at the New Hampshire
Women's Prison.  See Decl. of Helen E. Hanks ("Hanks Decl.")
¶ 6, Feb. 12, 2020 (Doc. No. 81-6, at 4); Pl.'s Personal Decl.,
Mar. 29, 2020 ("Czekalski Decl. III") ¶ 6 (Doc. No. 85-2, at 2);
see also Nov. 18, 2019 Stip. (Doc. No. 34) ("Stip. II").

Since November 2018, Rabbi Nafshi has been meeting with
Czekalski approximately once per month in her new capacity.
Their meetings are no longer held in the Chapel; they occur at
an open table in the NHSP Visiting Room, on a day when the other
tables are reserved for attorney-client visits.  Hanks Decl. ¶ 6
(Doc. No. 81-6, at 4).  Their meetings are one-on-one; inmate
Bader is not allowed to attend at the same time.  See 2019
Czekalski Dep. at 167-73 (Doc. No. 85-4, at 22-23).  Because
their meetings are considered to be contact visits, Czekalski
must undergo a visual strip search each time he finishes a
meeting with Rabbi Nafshi.  See Hanks Decl. ¶¶ 10, 12 (Doc. No.

81-6, at 5).  Czekalski has claimed that the restrictions on his contacts with Rabbi Nafshi both before and after her reclassification have violated his rights under RLUIPA and the First Amendment.

### D.   Size and Number of Books in Cells

Czekalski's claims here also challenge the DOC rules limiting the size and number of books and magazines he can keep in his cell, as applied to his written religious materials.  DOC policies provide that religious books retained by inmates "must be in compliance with the rules and regulations regarding personal property."  PPD 7.17 ¶ V(G)(1) (Doc. No. 11-2, at 4).

Inmates are generally allowed to keep no more than eleven books and magazines in their cells, with books limited in size to 9"x12" and magazines limited to 15"x17", but with no limits on the number of pages per publication.  See Czekalski Decl. III ¶¶ 2-3, at 1 (Doc. No. 85-2); Hanks Decl. ¶ 23 (Doc. No. 81-6, at 7); PPD 9.02 ¶ IV(P) (Doc. No. 11-1, at 6); DOC Property Inventory Form (Doc. No. 11-1, at 15); Decl. of Maj. Jon H. Fouts, Jan. 8, 2020 ("Fouts Decl.") ¶ 5 (Doc. No. 75-1, at 2).

### E.   Religious Goods Catalogs and Bulk Mail

Czekalski's religious practices also involve his use of religious materials that vendors market through bulk mailings.

DOC rules generally prohibit inmates from receiving bulk mail, including religious goods catalogs.  See Hanks Decl. ¶ 31 (Doc. No. 81-6, at 9).  Czekalski has claimed that without direct access to such catalogs, he is unable to identify and acquire the books or other items he needs for his religious practices.

      F.   Cell Feeds, Prayers, Sabbath Travel, and Fasts

          1.   Morning Prayers and Cell Feeds

Czekalski's religious practices include praying before breakfast every day.  His morning prayers typically take him about 45 minutes to an hour to complete.  2019 Czekalski Dep. at 70 (Doc. No. 85-3, at 78).  Czekalski wakes up at about 5:20 a.m. and is typically not done with his prayers in time to go to the chow hall for breakfast with his unit, which is generally called out sometime between 5:25 a.m. and 5:40 a.m.  See id. at 70-80 (Doc. No. 85-3, at 78-80).  Czekalski typically prepares his own breakfast from commissary food he buys.  See id. at 88 (Doc. No. 85-4, at 2).  In denying Czekalski's grievance requesting daily delivery of a chow hall breakfast to his cell ("cell feeds"), Commissioner Hanks explained that other Jewish inmates had been able to schedule their prayers and Sabbath practices around chow hall mealtimes.  See Resp. to Grievance, June 12, 2018 (Doc. No. 90, at 44).

14

2.   <u>Sabbath Observances, Fast Days, and Cell Feeds</u>

Czekalski observes his weekly Sabbath (Shabbat), which begins at sundown on Friday and ends at sundown on Saturday, by not walking beyond the confines of his unit's yard.  <u>See</u> 2019 Czekalski Dep. at 35-40 (Doc. No. <u>85-3</u>, at 69-70).  He does not walk to the chow hall for any meals on Saturdays, or for evening meals on Fridays in December and January when the days are short; instead, he eats commissary food he has saved for those days.  <u>See</u> <u>id.</u>

Commissioner Hanks denied Czekalski's grievance requesting regular delivery of a breakfast meal to his cell (a "cell feed") as a religious accommodation, <u>see</u> June 14, 2018 Response (Doc. No. <u>90</u>, at 44), but then directed on January 24, 2020 that Czekalski receive cell feeds during his Sabbath, <u>see</u> Hanks Decl. ¶ 27 (Doc. No. <u>81-6</u>, at 9).  Czekalski received cell feeds on two weekends in January 2020, but none were delivered to him in February or March 2020.  <u>See</u> Czekalski Decl. III (Doc. No. <u>85-2</u>, at 6-7).

Czekalski's religious practices require him to fast on certain days.  The record indicates there are six days in the Jewish calendar that may be observed by fasting, although Czekalski fasts on only one, Yom Kippur.  <u>See</u> 2019 Czekalski Dep. at 86, 94-95 (Doc. No. <u>85-4</u>, at 2, 4); <u>see also</u> DOC Faith Group Overview, PPD 7.17, attach. 3 (Doc. No. 12-2, at 11).

Czekalski has testified that he is not seeking a cell feed to break his fast after Yom Kippur through this lawsuit, as he previously arranged to obtain a post-fasting cell feed on that day.  See 2019 Czekalski Dep. at 86, 94-95 (Doc. No. 85-4, at 2, 4).

        G.   Head Covering

Czekalski's faith requires him to cover his head at all times.  DOC clothing rules do not generally allow inmates to wear knit caps or other hats inside, but those rules do not apply to yarmulkes worn by observant Jews.  Hanks Decl. ¶ 28 (Doc. No. 81-6, at 9).

Czekalski keeps one or two yarmulkes in his cell, and he has worn a yarmulke at court appearances in this case, but he maintains that his practice of covering his head does not require him to wear a yarmulke.  He considers a snug knit cap - the type approved by the prison for inmates to wear outdoors – to be a better head-covering since it stays on his head. Czekalski further states that some corrections officers have told him he cannot carry both a knit cap and a yarmulke at the same time, saying, "You only need one hat; pick one or the other," Czekalski Decl. I (Doc. No. 68-1, at 4).  When Czekalski has told those officers there is no rule against wearing a yarmulke under a hat, they have responded along the lines of,

16

"You are going to follow my rule."  See 2019 Czekalski Dep. at
116-18 (Doc. No. 85-4, at 9-10).

Although Czekalski submitted an Inmate Request Slip ("IRS")
stating that he should be allowed to choose the type of
religious head covering he wants, including a knit cap, see Jan.
21, 2018 IRS (Doc. No. 90, at 53), Czekalski did not raise the
issue of officers telling him he could not carry or wear a
yarmulke and a hat at the same time.  See 2019 Czekalski Dep. at
116-18 (Doc. No. 85-4, at 9-10).  DOC Director of Community
Corrections Kim MacKay responded to his knit-cap grievance,
explaining that a knit cap is not considered to be a religious
head-covering.  See Feb. 7, 2018 Resp. (Doc. No. 90, at 53).
Czekalski claims here that DOC policies and practices codify an
interpretation of Jewish practices that does not comport with
his knit cap practice.

### III. __PROCEDURAL HISTORY__

Czekalski filed the original complaint in this case in June
2018, several weeks after Rabbi Nafshi stopped visiting him at
the NHSP.  His original complaint included claims alleging
violations of his rights under the First Amendment's Free
Exercise and Establishment Clauses and RLUIPA.  He specifically
requested preliminary injunctive relief on the RLUIPA claims he
grouped together as "Count 1," regarding the impact of

17

restrictions on his contacts with Rabbi Nafshi at that time,
when she was still classified as a "religious volunteer."  See
Compl. (Doc. No. 1), at 13.  His original complaint also
included claims relating to his use of a knit cap as a religious
head-covering; the number and size of religious books he could
keep in his cell; his desire to receive religious goods
catalogs; and his demand for cell feeds to accommodate his
religious practices.

The court conducted a preliminary review of the original
complaint and allowed Czekalski's RLUIPA and First Amendment
claims to be served.  Defendants then filed a Rule 12(b)(6)
motion to dismiss.  While that motion was pending, the parties
negotiated a resolution of Czekalski's motion for a preliminary
injunction on Count 1.  Those negotiations led to Rabbi Nafshi's
agreement in November 2018 to resume visits with Czekalski as a
"religious visitor."

Czekalski responded to the new circumstances affecting his
contacts with Rabbi Nafshi after November 2018 by filing a
motion to amend (Doc. No. 37) the complaint, seeking to add
claims.  See Am. Compl. (Doc. No. 37-1).  The court, in an Order
issued in August 2019, partially granted the plaintiff's motion
to amend and partially granted defendants' Rule 12(b)(6) motion
to dismiss some of the claims that had been asserted in both the
original complaint and the Amended Complaint.  See Aug. 28, 2019

Order (Doc. No. 59) ("August 2019 Order").  The court has
identified the claims that survived the August 2019 Order as
follows[3]:

> 1.   By reclassifying Rabbi Nafshi as a religious visitor,
> defendants, NHSP Chaplain Daly and DOC Commissioner Hanks,
> substantially burdened Czekalski's ability to engage in his
> religious exercise of interacting with a rabbi, in
> violation of his rights under RLUIPA, in that:
>
> > a.   Czekalski must undergo a strip search after every
> > visit with Rabbi Nafshi;
> >
> > b.   Czekalski and Rabbi Nafshi cannot freely bring
> > books to their meetings or use the books in the Chapel
> > library during their meetings;
> >
> > c.   Their meeting place, the NHSP Visiting Room,
> > lacks the privacy needed for confidential counselling;
> > and
> >
> > d.   Czekalski cannot participate in group studies
> > with Rabbi Nafshi and other inmates.
>
> 2.   Defendants NHSP Chaplain James Daly and DOC
> Commissioner Helen Hanks have substantially burdened
> Czekalski's ability to interact with a rabbi, in violation
> of his rights under the First Amendment, rendering those
> defendants liable under 42 U.S.C. § 1983, in that:
>
> > a.   Defendants presently require that Czekalski
> > undergo a strip search after every visit with Rabbi
> > Nafshi, in her capacity as a religious visitor, in
> > violation of his rights under the First Amendment Free
> > Exercise Clause;

---

[3]The parties' summary judgment briefs refer to Czekalski's
claims as "Counts."  For consistency with the August 2019 Order
and convenience in responding to the parties' motions here, this
Order refers to Czekalski's claims using claim numbers and
subparts that substantially track those used in the August 2019
Order.

b.   Defendants do not presently allow Czekalski or Rabbi Nafshi to bring books to or use Chapel library books in their meetings, in her capacity as a religious visitor, in violation of Czekalski's rights under the First Amendment Free Exercise Clause;

c.   Defendants do not presently allow Czekalski to visit with Rabbi Nafshi in a location that is private, where he can receive confidential counselling on private matters, in her capacity as a religious visitor, in violation of his rights under the First Amendment Free Exercise Clause;

d.   Defendants do not presently allow Czekalski to join in group studies with Rabbi Nafshi, in her capacity as a religious visitor, in violation of his rights under the First Amendment Free Exercise Clause;

e.   When Rabbi Nafshi was classified as a religious volunteer, NHSP Chaplain James Daly did not allow Czekalski to correspond freely with her by mail, subject only to screening for security threats, in violation of Czekalski's rights under the First Amendment Free Exercise Clause;

f.   When Rabbi Nafshi was classified as a religious volunteer, NHSP Chaplain James Daly did not allow Czekalski to rely on her to provide him with assistance in acquiring religious books, religious property, and special foods for festivals, in violation of his rights under the First Amendment Free Exercise Clause;

g.   When Rabbi Nafshi was classified as a religious volunteer, NHSP Chaplain James Daly did not allow Czekalski to review written materials brought to the NHSP by Rabbi Nafshi, subject only to screening for security threats, in violation of his rights under the First Amendment Free Exercise Clause;

h.   When Rabbi Nafshi was classified as a religious volunteer, DOC restrictions as implemented by NHSP Chaplain James Daly caused Czekalski to lose access to Rabbi Nafshi's visits, in violation of his rights under the First Amendment Free Exercise Clause; and

      i.   Defendants' policies relating to inmate-clergy interactions violate the Establishment Clause, in that:

          A.   Defendants' rules as to "religious volunteers," as applied, are based on a Christian model of clergy as officiant or preacher, and not on the Jewish role of rabbis as educators or facilitators, whose role includes helping a Jew research issues related to Judaism and Jewry, assisting Jews in acquiring books and religious property, and assisting Jews in obtaining appropriate foods for religious festivals; and

          B.   Defendants' rules regarding inmate interactions with "religious visitors," as applied to Rabbi Nafshi, have resulted in Czekalski's visits with his rabbi being demeaned and treated like social visits.

3.   Defendants have substantially burdened Czekalski's ability to practice his faith with respect to religious property and books, in violation of his rights under RLUIPA, in that the DOC rules on (a) the cover size and (b) the number of books an inmate may maintain in his cell, coupled with the lack of secure book storage in the NHSP Chapel library, prevent Czekalski from keeping the books he needs to practice his religion.

4.   Commissioner Hanks substantially burdened Czekalski's ability to practice his faith with respect to the chow hall meal schedule and the availability of cell feeds, in violation of his rights under RLUIPA, in that:

      a.   Commissioner Hanks refused Czekalski's request for cell feeds for breakfast to accommodate his morning prayer schedule;

      b.   Commissioner Hanks refused Czekalski's request for cell feeds to break the fast after all six Jewish fast days; and

      c.   Commissioner Hanks refused Czekalski's request for cell feeds to accommodate his observance of the Sabbath by avoiding the walk to chow hall each Saturday and on Friday evenings in December and January.

5.   Commissioner Hanks has violated Czekalski's First
Amendment rights under the Establishment Clause, rendering
her liable under 42 U.S.C. § 1983, by citing a rationale
that favors religious practices that differ from
Czekalski's actual practice of Judaism, in that:

    a.   Commissioner Hanks refused Czekalski's request to
    receive a cell feed for breakfast to accommodate his
    morning prayer schedule;

    b.   Commissioner Hanks refused Czekalski's request for
    cell feeds to break his fasts after any fast days other
    than Yom Kippur; and

    c.   Commissioner Hanks refused Czekalski's request
    for cell feeds to accommodate his observance of the
    Sabbath by avoiding the walk to chow hall on the dates
    and times when he observed the Sabbath, every Saturday
    and, in December and January, on Friday evenings.

6.   Commissioner Hanks has substantially burdened
Czekalski's religious practice of wearing a head covering,
in violation of his rights under RLUIPA, in that:

    a.   Czekalski has been required to remove his head
    covering during meals at the NHSP; and

    b.   Czekalski has been told he cannot have both a hat
    and a yarmulke in his possession at the same time,
    although the yarmulke does not stay on outside.

7.   Commissioner Hanks has substantially burdened
Czekalski's ability to practice his religion by wearing a
head covering, in violation of his rights under the First
Amendment, rendering her liable under 42 U.S.C. § 1983, in
that:

    a.   Commissioner Hanks has burdened Czekalski's
    practice of covering his head, in violation of the
    Free Exercise Clause, by denying Czekalski's
    grievances and allowing restrictions on his use of a
    knit cap as a religious head covering (i.) inside and
    (ii.) outside;

    b.   By denying Czekalski's grievances, Commissioner
    Hanks defined what constitutes a "religious head-

covering" in a manner favoring a practice of Judaism that differs from Czekalski's practices, in violation of the Establishment Clause.

8.   DOC mail regulations as implemented by Commissioner Hanks and NHSP Chaplain Daly do not allow Czekalski to receive bulk mail catalogs, which he needs to acquire religious books and property, and such catalogs are not otherwise available to Czekalski, in violation of his rights under RLUIPA.

The August 2019 Order limited Czekalski's available relief on certain of the above-listed claims by:

- Dismissing Czekalski's claims for damages asserted under RLUIPA, and his claims for damages asserted against any defendant in his or her official capacity;

- Dismissing Claims 2(e)-(h) and 2(i)(A) to the extent they sought injunctive relief; and

- Dismissing Claims 2(e)-(h) and 2(i)(A) to the extent they sought damages against Commissioner Hanks in her individual capacity.

See Aug. 28, 2019 Order (Doc. No. 59), at 28.

In two partial summary judgment motions (Doc. Nos. 68, 69), Czekalski seeks relief on each of his RLUIPA claims that survived the August 2019 Order (Claims 1, 3, 4, 6, and 8). Defendants filed their own motion for summary judgment on Czekalski's First Amendment and RLUIPA claims.  See Doc. No. 81.

## IV.  DISCUSSION

### A.  Ripeness (Claims 4(b), 5(b))

In Claims 4(b) and 5(b), Czekalski asserts that Commissioner Hanks's denial of his grievance seeking a cell feed at the end of each Jewish fast day violated his rights under RLUIPA and the First Amendment.  Defendants argue that those claims are not justiciable at this time.

> [A] claim is ripe only if the party bringing suit can show both that the issues raised are fit for judicial decision at the time the suit is filed and that the party bringing suit will suffer hardship if "court consideration" is withheld.

Labor Rels. Div. of Constr. Indus. of Mass. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016) (citation omitted); see also Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017).  Czekalski testified he does not presently observe any fast other than Yom Kippur, and he is not sure whether he will observe any fasts other than Yom Kippur in the future.  See 2019 Czekalski Dep. at 94-98 (Doc. No. 85-4, at 4-5); Czekalski Decl. I (Doc. No. 68-1, at 5-6).  He further testified he is not seeking cell feeds to break his Yom Kippur fast in this case.  See 2019 Czekalski Dep. at 94-98 (Doc. No. 85-4, at 4-5).

Whether Czekalski will observe a religious fast on any day other than Yom Kippur in the future, what that fast might entail, and whether he will be able to receive a post-fasting meal without court involvement is not presently known, making

Claims 4(b) and 5(b) unripe for resolution at this time.  The
speculative nature of the claims counsels against any finding of
hardship; and there is no evident prejudice in making Czekalski
wait until such time as he observes a fast, does not receive a
cell feed, and then completes the process of grieving that
issue, see 42 U.S.C. § 1997e(a), before seeking judicial relief.
Accordingly, plaintiff's (first) motion for partial summary
judgment (Doc. No. 68) is denied as to his post-fasting cell
feed claim (Claim 4(b)).  Defendants' motion for summary
judgment is granted, in part, to the extent that both Claims
4(b) and 5(b), relating to that cell feed claim, are dismissed
as unripe.

### B.   PLRA Exhaustion

In their motion for summary judgment, defendants rely on
the affirmative defense that Czekalski has failed to exhaust his
claims through the DOC's administrative grievance process, as
required by the Prison Litigation Reform Act, 42 U.S.C.
§ 1997(e) ("PLRA").  The defendants specifically argue that
Czekalski failed to exhaust any of his claims that seek money
damages as relief, and any of his claims asserted under RLUIPA
and the First Amendment arising from Rabbi Nafshi's November
2018 reclassification as a religious visitor (Claims 1(a)-(d),
2(a)-(d), and 2(i)(B)).

The pertinent provision of the PLRA provides as follows:

> No action shall be brought with respect to prison
> conditions under section 1983 of this title, or any other
> Federal law, by a prisoner confined in any jail, prison, or
> other correctional facility until such administrative
> remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  The PLRA exhaustion requirement applies

to RLUIPA claims and § 1983 claims.  See Cutter v. Wilkinson,

544 U.S. 709, 723 n.12 (2005); Fuqua v. Ryan, 890 F.3d 838, 844,

846 n.9 (9th Cir. 2018).


### 1.   Preservation of Exhaustion Defense

Czekalski argues that defendants waived the PLRA exhaustion

defense and forfeited their ability to move for summary judgment

on that defense by failing to comply with a scheduling order in

this case that set a deadline for motions based on PLRA

exhaustion, which expired in 2019, before defendants filed their

motion.  I address those waiver and forfeiture arguments before

turning to the merits of the defendants' PLRA exhaustion

defense.

In general, a party preserves an affirmative defense by

stating it in the answer.  See Fed. R. Civ. P. 8(c)(1).

Defendants' list of defenses in their September 11, 2019 Answer

(Doc. No. 61) explicitly cited plaintiff's failure to comply

with the PLRA exhaustion requirement as an affirmative defense.

Answer at 13.  They had previously listed the same defense in

the same terms in their October 4, 2018 proposed discovery plan
(Doc. No. 18), and defendants specifically proposed that summary
judgment proceedings in this case be bifurcated, with an earlier
deadline for motions for summary judgment based on "PLRA
Exhaustion," and a later deadline for summary judgment based on
"[a]ll other issues."  Oct. 16, 2018 Order on Discovery Plan
(Doc. No. 20).  Because defendants listed PLRA exhaustion in
their October 2018 discovery plan and in their September 11,
2019 Answer, plaintiff received timely notice regarding that
defense in this case.

Czekalski argues that the defendants nevertheless waived
the defense when they failed to brief it sooner in a motion on
the pleadings.  Since PLRA exhaustion is an affirmative defense,
defendants' failure to raise that issue at the pleading stage is
not a waiver.  Cf. Albino v. Baca, 747 F.3d 1162, 1170 (9th Cir.
2014) (en banc) (summary judgment motion, not Rule 12(b) motion,
is appropriate device for pretrial resolution of exhaustion
issues if material facts are undisputed).

Plaintiff argues that the defendants waived the defense by
failing to file their motion for summary judgment based on PLRA
exhaustion on or before the latest date allowed in the
scheduling order for such motions.  See Sept. 27, 2019 Order
(establishing Sept. 19, 2019 (nunc pro tunc) as deadline for
PLRA summary judgment motions, and establishing later deadline

for merits-based summary judgment motions).  In general,
however, an exhaustion defense may be "adjudicated at any point
in the development of a lawsuit that the rules of procedure
allow," including in an evidentiary hearing before the court.
Anderson v. Jutzy, 175 F. Supp. 3d 781, 786 (E.D. Mich. 2016).
Since defendants were neither ordered by the court, nor required
by any generally applicable procedural rule, to litigate their
PLRA exhaustion defense through the summary judgment process,
their failure to file a motion raising that issue by the
September 19, 2019 deadline in the scheduling order for such
motions is not properly deemed to be a waiver of that defense.

### 2.   Scheduling Order Noncompliance

Defendants' failure to meet the scheduling order's deadline
for summary judgment motions asserting PLRA exhaustion issues
raises the question of whether that noncompliance should stop
the court from considering the merits of the defendants' PLRA
exhaustion defense in ruling on their motion for summary
judgment.  In general, the court has discretion to extend or
reopen a scheduling order's deadline to consider the merits of a
late-filed motion for "good cause."  See Fed. R. Civ. P. 16(b).
Factors that may be relevant to that inquiry include the moving
party's diligence and reasons for the delay, the potential
prejudice to the opposing party, and the impact of the delay on

the orderly administration of the court's docket.  Rosario-Diaz
v. Gonzalez, 140 F.3d 312, 316 (1st Cir. 1998).

　　　Defendants filed their motion for summary judgment before
the deadline for filing non-PLRA summary judgment motions, but
without filing any motion to reopen the PLRA exhaustion motion
deadline.  Although the diligence of the party seeking an
extension generally carries the most weight, see id. at 315; see
also O'Connell v. Hyatt Hotels of P.R., 357 F.3d 152, 155 (1st
Cir. 2004) (noncompliant party's "indifference" to scheduling
order can be determinative, even in absence of prejudice), a
court's discretionary decision to extend deadlines in a
particular case can rest on the court's interest in managing its
own docket, coupled with a lack of prejudice to the opposing
party.  See, e.g., Felix v. Lugas, No. 1:00-cv-12225-WGY, 2004
WL 1775996, at *1 n.2, 2004 U.S. Dist. LEXIS 15520, at *2 n.2
(D. Mass. Mar. 2, 2004) (finding good cause based on lack of
prejudice and likelihood that recommended disposition could
expedite final resolution), R&R adopted, No. 1:00-cv-12225-WGY
(D. Mass. Mar. 26, 2004).  Cf. O'Brien v. Town of Bellingham,
943 F.3d 514, 527 (1st Cir. 2019) ("district court judges 'enjoy
great latitude in carrying out case-management functions'"
(citation omitted)).

　　　Here, I find that case management issues and the absence of
prejudice to the plaintiff carry substantial weight in the good

cause inquiry.  Addressing the PLRA exhaustion defense on the merits in the context of the parties' cross-motions for summary judgment is likely to promote judicial economy and the orderly disposition of issues without causing the plaintiff any undue prejudice.  The parties exchanged all pertinent grievance documents relating to Czekalski's claims in the original complaint in October/November 2018.  See Oct. 16, 2018 Order (Doc. No. 20) (setting deadlines for exchange of grievance records).  Plaintiff had adequate notice and time after defendants filed their September 2019 answer preserving their PLRA exhaustion defense to undertake any additional discovery relating to the Amended Complaint before defendants filed their summary judgment motion in February 2020.  In addition, the court granted the plaintiff's request for extra time and pages to respond to defendants' summary judgment motion.  The PLRA exhaustion issues have been briefed and could be ripe for disposition now, to the extent defendants establish that the material facts are undisputed.

Furthermore, exhaustion requirements, in general, are mechanisms of "'judicial traffic control.'"  Albino, 747 F.3d at 1170 (citation omitted).  The judge, not a jury, is ultimately responsible for ruling on the merits of a PLRA exhaustion defense.  See id.; Messa v. Goord, 652 F.3d 305, 308-10 (2d Cir. 2011).  That means, as to any claims that survive the cross-

motions for summary judgment, I could be called to rule on the merits of the defendants' PLRA exhaustion defense in this case in a pretrial proceeding, even if I were to deem defendants' instant summary judgment motion to be untimely to the extent it seeks relief based on their PLRA exhaustion defense.  Nothing in the record suggests, however, that any additional proceedings or briefing going forward would aid in the fair resolution of any PLRA exhaustion issues that can be resolved on undisputed facts as a matter of law now.

Under such circumstances, I find that there is good cause to modify the scheduling order, nunc pro tunc, to allow for my consideration of defendants' PLRA exhaustion arguments in their motion for summary judgment, and to resolve those issues if there is no factual dispute.  I thus turn to considering those issues.

### 3.   PLRA Exhaustion Requirements

The PLRA exhaustion requirement is designed to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Porter v. Nussle, 534 U.S. 516, 524-25 (2002).  Claims that have not been exhausted through the available administrative remedy procedures in prison are subject to dismissal.  Kasiem v. Switz, 756 F. Supp. 2d 570, 575 (S.D.N.Y. 2010).

31

"[P]roper exhaustion" is required by the statute, which means an inmate must use all of the steps that the prison grievance system makes available in its administrative grievance process, and do so in conformity with the prison's deadlines and other critical procedural rules.  Woodford v. Ngo, 548 U.S. 81, 84, 90 (2006).  "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Jones v. Bock, 549 U.S. 199, 218 (2007).  The PLRA's proper exhaustion requirement provides prison officials with an opportunity: (1) to impose an orderly structure on the proceedings before them; (2) to correct their own errors; and (3) to create an administrative record that is helpful to the court.  Woodford, 548 U.S. at 90-91, 93-95.  There is one exception to the rule requiring that a prisoner exhaust all of the administrative remedies provided by the prison; that is, "a prisoner need exhaust only 'available' administrative remedies."  Ross v. Blake, 136 S. Ct. 1850, 1856 (2016).

The failure to exhaust available grievance remedies is an affirmative defense as to which defendants bear the burden of proof.  See Jones, 549 U.S. at 216; Albino, 747 F.3d at 1172.  At the summary judgment phase, defendants bear the initial burden of showing that plaintiff failed to exhaust generally available administrative remedies.  See Hubbs v. Suffolk Cty. Sheriff's Dep't, 788 F.3d 54, 59 (2d Cir. 2015); Albino, 747

F.3d at 1172; <u>Tuckel v. Grover</u>, 660 F.3d 1249, 1254 (10th Cir.
2011).  Then, "the burden shifts to the prisoner to come forward
with evidence showing that there is something in his particular
case that made the existing and generally available
administrative remedies effectively unavailable to him."
<u>Albino</u>, 747 F.3d at 1172; <u>see</u> <u>also</u> Tuckel, 660 F.3d at 1254.


### 4.   DOC Grievance Process

The DOC has a three-step grievance policy that requires
inmates to provide "sufficient detail" regarding "the nature of
the complaint or request and what relief or action is requested"
in the grievance documents submitted at all three levels: the
inmate's IRS (Level I), appeal to the Warden (Level II), and
final appeal to the DOC Commissioner (Level III).  Hanks Decl.
¶ 8 (citing PPD 1.16 ¶¶ IV(A)(2), (B)(2), (C)(2)).  This
requirement affords corrections officials the opportunity to
resolve an inmate's complaints internally at the lowest
effective level.  <u>See</u> <u>Sunn v. Cattell</u>, No. 02-cv-168-M, 2002 DNH
197, 2002 WL 31455482, at *4, 2002 U.S. Dist. LEXIS 21472, at
*12 (D.N.H. Oct. 31, 2002).


### 5.   Exhaustion Efforts as to Religious Visitor Claims

Defendants move for summary judgment as to Claims 1(a)-(d),
2(a)-(d), and 2(i)(B), based on Czekalski's alleged failure to

properly exhaust those claims, which arise from the restrictions
placed on Czekalski's contacts with Rabbi Nafshi after she
became a religious visitor in November 2018.  Czekalski sought
leave to add those claims to this action in January 2019, and
the court granted him leave to do so in the August 2019 Order.
As evidence that Czekalski did not exhaust his grievance
remedies relating to those claims before he sought to add them
to this case, defendants offer Commissioner Hanks's sworn
statement:

> Mr. Czekalski undertook to amend his lawsuit by asserting
> that restrictions imposed on his interactions with Rabbi
> Nafshi, now as a religious visitor, substantially burdened
> his exercise of religion.  Mr. Czekalski grieved none of
> those asserted restrictions.

Hanks Decl. ¶ 7 (Doc. No. 81-6, at 4) (emphasis in original).

Czekalski has not produced any evidence showing he invoked
or exhausted the grievance process as to those claims after
November 2018, when Rabbi Nafshi was reclassified as a religious
visitor.  And it is undisputed that until November 2018, Rabbi
Nafshi had never registered as a "religious visitor," and thus
never had contacts with Czekalski prior to November 2018 to
which the "religious visitor" rules applied.  This court has
reviewed the grievance records in the docket, and there are no
pertinent grievance documents that substantiate Czekalski's
unsworn assertion that he exhausted his claims relating to the
"religious visitor" restrictions before he filed this lawsuit.

Those grievances, without exception, concern the "religious
volunteer" restrictions at issue in Claims 2(e), 2(g), and 2(h),
to the extent they appear to relate to Rabbi Nafshi at all.
See, e.g., Doc. No. 90, at 124-30.

Czekalski has not argued that the grievance process was
unavailable to him with respect to his contacts with Rabbi
Nafshi after November 2018.  Nor could he, given the record
before this court, which contains an abundance of IRSs and
grievance forms he filed about his religious practices.  See,
e.g., Doc. No. 90, at 43-166.  Under such circumstances, there
is no genuine issue of material fact regarding whether the
grievance process was sufficiently available to Czekalski.
Under the PLRA, he was required to use that process properly.

Accordingly, defendants' motion for summary judgment is
granted, in part, to the extent it is based on plaintiff's
failure to exhaust his available administrative remedies as to
Claims 1(a)-(d), 2(a)-(d), and 2(i)(B).  Those claims are
dismissed.  Czekalski's (second) motion for partial summary
judgment (Doc. No. 69), seeking judgment as a matter of law in
his favor on "Count 1" is thus denied.  Defendants' motion for
summary judgment (Doc. No. 81) on Count I is granted.

6.   Exhaustion of Claims for Money Damages

Defendants also move for summary judgment on all of plaintiff's claims for money damages in this action, arguing that plaintiff failed to properly exhaust those claims.  Defs.' Mot. for Summ. J. at 27 (Doc. No. 81).  Commissioner Hanks's declaration states that the DOC grievance policy (which is not reproduced as part of the record here) requires inmates to provide details regarding the relief or action they request at each level of the grievance process, and that Czekalski did not include a demand for "money damages" in his grievances relating to the claims for money damages in this case.

The record shows that Czekalski submitted a number of grievances that described the types of relief or action he wanted prison officials to provide to him through the grievance process, including, for example: cell feeds; the ability to wear a knit cap indoors without harassment; a loosening of limits on his access to bulk mail catalogs; and more secure storage for books about Judaism in the Chapel library.  To that extent, his grievances were consistent with the grievance policy's requirement that inmates detail the relief or action they seek.

The DOC grievance policy is not an exhibit in this case. The grievance forms in the record do not state whether inmates must list damages.  See, e.g., Doc. No. 90, at 47-50.  The record before me is silent as to whether the policy explicitly

36

requires an inmate to list "money damages" or "compensation" as part of the relief requested, regardless of whether such relief is available through the grievance process.  This case is thus distinguishable from cases such as Johnson v. Wireman, 809 F. App'x 97, 99 (3d Cir. 2020) (where prison grievance procedures state that inmate "must" or "should" specify whether he seeks "compensation," inmate's failure to include a request for compensation in his grievances "did not properly exhaust his claim for money damages").

In Morales v. Doe #2, No. 17-cv-234-SM, 2020 DNH 046, 2020 WL 1433776, 2020 U.S. Dist. LEXIS 51134 (D.N.H. Mar. 24, 2020), the defendant prison officials unsuccessfully pressed the same exhaustion argument raised here, concerning an inmate's failure in that case to demand damages in his grievance documents.  The court in Morales observed that defendants' argument asserted the converse of the holding in Booth v. Churner, 532 U.S. 731, 734 (2001) (prisoners must exhaust such prison grievance processes as are available, even if the money damages they ultimately seek in court are not offered as a grievance remedy).  In turning that holding around to serve their argument - that an NHSP inmate must demand money damages from prison officials before such damages may be requested in court – defendants effectively divorced the outcome in that case from its rationale.  See Booth, 532 U.S. at 739 ("one 'exhausts' processes, not forms of

relief"), cited in Morales, 2020 U.S. Dist. LEXIS 51134, at *20, 2020 WL 1433776, at *7.

In light of such cases and record evidence that appears inconsistent with Commissioner Hanks's declaration,[4] I conclude that defendants have not shown that there is an absence of material fact as to whether Czekalski failed to properly exhaust his available prison grievance remedies as to all of his claims for money damages.  Accordingly, I deny defendants' motion for summary judgment, in part, to the extent they seek an order precluding all claims for money damages here based on the PLRA.

C.   Establishment Clause Claims

Defendants seek judgment as a matter of law on Czekalski's Establishment Clause claims, including his claims concerning restrictions applicable to Rabbi Nafshi when she was a religious volunteer (Claim 2(i)(A)).  Czekalski highlights no particular terms of the policies at issue that promote one religion or one type of clergy over another; rather, he has claimed that the DOC rules governing "religious volunteers" violate the Establishment Clause because they are modeled on and favor what he considers

--------

[4]See May 2018 Grievance, Doc. No. 90, at 46 ("All I want are breakfast cell feeds . . . . But take note, if I am forced to litigate this issue, I will be seeking . . . compensation for every meal I have had to provide for myself.").

to be the principal role of clergy in some Christian faiths (especially, "Catholic priests"): preaching, leading group services, and administering sacraments.  To that extent, he claims that the religious volunteer rules are not equally applicable to, compatible with, or supportive of, the "educator," "facilitator," and social-worker roles of Jewish rabbis; and, as applied to Rabbi Nafshi, he claims those rules impaired the value of her contacts with him to a greater extent than they impair the ability of a Catholic priest to perform what the priest's faith and Catholic inmates principally require of clergy.  Defendants contend that they are entitled to qualified immunity with respect to that Establishment Clause claim.

### 1.   Principles and Tests under Establishment Clause

The Establishment Clause, made applicable to the States through the Fourteenth Amendment, see Everson v. Bd. of Educ., 330 U.S. 1, 8 (1947), provides that "Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.

> The First Amendment's Establishment Clause bars a state
> from preferring one religion over another, but states
> remain free to "accommodate religious practices . . .
> without violating the Establishment Clause."

Staples v. N.H. State Prison, No. 16-cv-33-PB, 2017 DNH 046, 2017 WL 1288457, at *5, 2017 U.S. Dist. LEXIS 39615, at *13

(D.N.H. Mar. 17, 2017) (internal citation omitted) (quoting Cutter, 544 U.S. at 713).

In evaluating whether there are Establishment Clause problems with state laws or practices that do not involve monuments or other "long-standing" ceremonial invocations and uses of religious symbols, the Supreme Court has articulated "three interrelated analytical approaches":

> the three-prong analysis set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971); the "endorsement" analysis, first articulated by Justice O'Connor in her concurrence in Lynch v. Donnelly, 465 U.S. 668, 688 (1984), and applied by a majority of the Court in County of Allegheny v. ACLU, 492 U.S. 573 (1989); and the "coercion" analysis of Lee v. Weisman, 505 U.S. 577, 587 (1992).

Freedom from Religion Found. v. Hanover Sch. Dist., 626 F.3d 1, 7 (1st Cir. 2010); see also Am. Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2081-87, 2089 (2019) (eschewing Lemon test in case involving "longstanding monuments, symbols, and practices").

Under Lemon, a government policy or practice violates the Establishment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, or (3) it fosters an excessive entanglement with religion.  Lemon, 403 U.S. at 612-13.  The endorsement analysis considers whether "the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion," Freedom From Religion Found., 626 F.3d at 10 (citations, brackets, and

internal quotation marks omitted).  The coercion test is premised on the guarantee that the "government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'"  Lee, 505 U.S. at 587 (citation omitted).

At least one circuit court has held that prison policies ostensibly accommodating inmates' religious freedom – if challenged as invalid under the Establishment Clause – are properly subjected to the test developed in Turner v. Safley, 482 U.S. 78, 89 (1987).  See Brown v. Collier, 929 F.3d 218, 244 (5th Cir. 2019).  Under this test, a court must find such prison policies to be valid, if they are "reasonably related to legitimate penological interests," while appropriately deferring to prison officials' judgments in matters of prison administration that are within their professional expertise.  Turner, 482 U.S. at 89; see also Brown, 929 F.3d at 244 (applying Turner factors to Establishment Clause claims).  I need not stake out a position on the applicability of Turner because it does not affect my analysis of Czekalski's Establishment Clause claims.

2.  Qualified Immunity

Government officials, in undertaking actions claimed to violate federal rights, are "'entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'"  Hunt v. Massi, 773 F.3d 361, 367 (1st Cir. 2014) (citation omitted); see also Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (qualified immunity "'protects all but the plainly incompetent or those who knowingly violate the law'" (citation omitted)).  When a defendant invokes qualified immunity, the burden is on the plaintiff to show its inapplicability.  See Rivera-Corraliza v. Puig-Morales, 794 F.3d 208, 215 (1st Cir. 2015).

The "clearly established" inquiry has two related aspects: (1) the clarity of the law when the alleged misconduct occurred; and (2) the clarity of the law as applied to the circumstances at issue.  See Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 9 (1st Cir. 2013).  In general, the clearly-established inquiry must be undertaken in light of the specific context of the case, not as a broad generalized proposition, except in obvious or extreme cases.  See Brosseau v. Haugen, 543 U.S. 194, 199 (2004).  "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the

42

defendant's shoes would have understood that he was violating it.'"  Kisela, 138 S. Ct. at 1153.

In moving for summary judgment on Claim 2(i)(A), defendants have invoked the doctrine of qualified immunity.  The pertinent question for this court's analysis of that defense is contextual: whether a reasonable prison official would have been aware that a prison policy allowing a volunteer clergy member to perform group religious activities with Jewish inmates in prison, including participating in ceremonies such as those that Catholic inmates may expect or require their clergy to lead, would violate the Establishment Clause if that policy also limited the same volunteer's ability to provide personal instruction and counseling through the mail or phone calls, and other forms of individualized assistance or social work, which those who practice Judaism may expect or require of their clergy.  The cases cited in the briefs relating to religious volunteer policies are neither on point nor supportive of a finding of an Establishment Clause problem in the circumstances giving rise to Claim 2(i)(A).  See, e.g., Brown, 929 F.3d at 252-54 (policy requiring inmate religious groups to be directly supervised by guards or outside volunteers, which had the effect of making availability of congregate services dependent on outside volunteer availability, did not violate Establishment Clause, as policy was neutral with respect to content, and was

reasonably related to legitimate safety and security interests;
and fact that more Christian than Muslim volunteers were
available was not due to prison policy).  Cf. Bader v. Wrenn,
675 F.3d 95, 99 (1st Cir. 2012) ("Bader II") (no RLUIPA
violation had been shown as to inmate's transfer that negatively
impacted his access to group worship and counseling, where those
religious disadvantages depended proximately on decisions and
actions not attributable to transfer).  Those cases do not
demonstrate that there is established law, controlling cases, or
a consensus of persuasive authority, that would alert reasonable
prison officials to an Establishment Clause problem in this
context.

Czekalski seeks to redefine the pertinent question for the
qualified immunity analysis to include allegations that a
religiously-biased chaplain was operating a state-funded
Catholic Church at the NHSP.  But that claim differs
substantially from the Establishment Clause claims that this
court has allowed to proceed in this case.  Moreover, that claim
lacks evidentiary support.  If construed in a light most
favorable to plaintiff, all of the evidence concerning incidents
in which Chaplain Daly may have harbored or expressed a
religious bias involve other parties and circumstances that are
too remote in time and unconnected to the circumstances at issue

44

here,[5] to allow a reasonable jury to find that any religious bias
has affected defendants' development or implementation of the
policies at issue.  The evidence and cases Czekalski cites in
support of his conclusory arguments bear little resemblance to
the evidence in the record here relating to Claim 2(i)(A).[6]

Czekalski has thus failed to carry his burden of
demonstrating that qualified immunity is unavailable as to Claim
2(i)(A).  I grant defendants' motion for summary judgment, with
respect to Claim 2(i)(A).

---

[5]The November 9, 2019 Declaration of Christopher Palermo
(Doc. No. 29-1), for example, expresses that inmate's opinion
that Chaplain Daly has operated a "de facto Catholic Church"
that discriminates against non-Catholics, including,
specifically, Palermo's Pagan religion.

[6]See, e.g., Lemon, 403 U.S. at 623 (school-aid statute
authorizing government inspection of parochial school records
created impermissible relationship between church and state);
Cutter, 544 U.S. at 720 (RLUIPA on its face does not violate
Establishment Clause, because, among other things, it does not
single out any bona fide faith for disadvantageous treatment);
Hernandez v. Comm'r, 819 F.2d 1212 (1st Cir. 1987) (finding no
Establishment Clause violation in content-neutral disallowance
of charitable deductions for payments made to a church, where
church provided commensurately-valued services in return for
such payments), aff'd, 490 U.S. 680 (1989); Bader v. Wrenn, 532
F. Supp. 2d 308, 312 (D.N.H. 2008) ("Bader I") (prison's
recommendation that inmate participate in secular rehabilitation
program did not violate Establishment Clause even though
program's core principal had roots in Quaker philosophy).

### 3.   Remaining Establishment Clause Claims

The August 2019 Order identified several other Establishment Clause claims -- Claims 5(a), 5(c), and 7(b) -- that survived defendants' Rule 12(b)(6) motion, which the court allowed to proceed as claims for damages and injunctive relief. Those claims challenge what Czekalski characterizes as evidence that the prison favors the religious practices of Jewish inmates whose observances differ from his.

Neither plaintiff nor defendants briefed Claims 5(a), 5(c), and 7(b) in their cross-motions for summary judgment. Defendants' motion for summary judgment does not list those Establishment Clause claims as claims stated in the pleadings. In the absence of a motion specifically targeting those claims, and without briefing on whether the facts are undisputed and as to the reasons why summary judgment is appropriate on Claims 5(a), 5(c), and 7(b), the court declines to address them further at this time.  The court anticipates that in the case management conference to be scheduled regarding the issues that survive this Order, the parties will present joint or separate proposals for the expeditious resolution of those claims, including as appropriate, a supplemental round of dispositive motions.

D.    Remaining Injunctive Relief Claims

The last set of injunctive relief claims at issue in the parties' motions arise under RLUIPA (Claims 3, 4(a), 4(c), 6, 8) and the Free Exercise Clause (Claim 7(a)).

1.    RLUIPA

RLUIPA bars certain prisons, including the NHSP, "from substantially burdening an inmate's religious exercise unless the regulation under attack is the least restrictive way to advance a compelling state interest." Kuperman v. Wrenn, 645 F.3d 69, 79 (1st Cir. 2011).  To state a claim under RLUIPA, the "plaintiff bears the burden of demonstrating that he or she wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." LeBaron v. Spencer, 527 F. App'x 25, 28 (1st Cir. 2013) (internal quotation marks and citation omitted).

> Once a plaintiff has established that his religious exercise has been substantially burdened, the onus shifts to the government to show [] that the burden furthers a compelling governmental interest and [] that the burden is the least restrictive means of achieving that compelling interest.

Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 38 (1st Cir. 2007); see also Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S.

707, 718 (1981) ("'only those interests of the highest order'"
may be sufficiently compelling (citation omitted)).

In general, RLUIPA provides more protections to an inmate's
religious exercise than the First Amendment Free Exercise
Clause.  Yahtues v. Dionne, No. 16-cv-174-SM, 2020 DNH 050, 2020
WL 1492877, at *10, 2020 U.S. Dist. LEXIS 53254, at *30 (D.N.H.
Mar. 27, 2020) (citations omitted).  "Therefore, '[i]f there is
no RLUIPA violation, there will be no Free Exercise Clause
violation.'"  Id. (citations omitted).

Defendants here do not generally dispute that plaintiff's
sincerely-held Jewish faith drives each of the religious
practices and observances at issue.  And they do not dispute
that those practices and observances are "religious exercises,"
to which RLUIPA applies.  Moreover, it is undisputed that a
prison's compelling interests can include staunching the flow of
contraband within and into a prison, see Holt v. Hobbs, 574 U.S.
352, 363 (2015), and protecting life and property from cell
fires, see Washington v. Klem, 497 F.3d 272, 284 (3d Cir. 2007).
At issue here with respect to each RLUIPA claim is whether the
prison policies as applied to Czekalski have substantially
burdened his religious practices, and, if so, whether a
reasonable jury could find that those policies are the least
restrictive means of advancing compelling safety and security
interests.

48

2.   Substantial Burden

Plaintiff has the burden of demonstrating that his

religious exercise has been substantially burdened:

> [A] substantial burden on one's exercise of religion
> exists "[w]here the state conditions receipt of an
> important benefit upon conduct proscribed by a
> religious faith, or where it denies such a benefit
> because of conduct mandated by religious belief,
> thereby putting substantial pressure on an adherent to
> modify his behavior and to violate his beliefs."

Perrier-Bilbo v. United States, 954 F.3d 413, 431 (1st Cir.

2020) (citing Thomas, 450 U.S. at 717-18; Navajo Nation v. U.S.

Forest Serv., 535 F.3d 1058, 1069-70 (9th Cir. 2008) ("a

'substantial burden' is imposed only when individuals are forced

to choose between following the tenets of their religion and

receiving a governmental benefit or coerced to act contrary to

their religious beliefs by the threat of civil or criminal

sanctions" (internal citations omitted))).

The plaintiff must also show that the government is

responsible for that burden.  Cf. Bader II, 675 F.3d at 99

(where inmate's religious disadvantages depended proximately on

decisions and actions that were not attributable to government,

no RLUIPA violation had been shown); Ouahman v. Barnes, No. 11-

CV-075-SM, 2012 WL 5303292, at *4, 2012 U.S. Dist. LEXIS 153508,

at *10 (D.N.H. Oct. 1, 2012) (where prison provided instructions

to inmate on how to get religious text on his own and then took

no steps to prohibit him from doing so, RLUIPA was not violated
by failure to provide religious text directly to inmate), R&R
adopted, No. 11-CV-75-SM, 2012 WL 5303302, 2012 U.S. Dist. LEXIS
153493 (D.N.H. Oct. 25, 2012).


### 3.  Least Restrictive Means

If plaintiff has shown that a prison policy has
substantially burdened his religious exercise, defendants can
avoid liability by showing that the policy at issue is the least
restrictive means of advancing a compelling interest.  In making
that showing, prison officials must generally demonstrate that
they have actually considered and rejected the efficacy of "at
least some" other, less restrictive measures before adopting the
challenged policies.  Spratt, 482 F.3d at 41 & n.11.  "A blanket
statement that all alternatives have been considered and
rejected . . . will ordinarily be insufficient."  Id. at 41
n.11.


### 4.  Limits on Catalogs, Books, and Magazines

In Claims 3(a) and 3(b), plaintiff moves for summary
judgment on his RLUIPA claims challenging the prison's limits on
the size and number of books and magazines that he can keep in
his cell, as applied to his religious books.  Those claims are
properly considered along with Claim 8, challenging defendants'

practice of prohibiting inmates from receiving bulk mail, which
Czekalski asserts impairs his ability to use religious goods
catalogs to identify and purchase the items and books he needs
to study and practice his Jewish faith.  Defendants object to
each of those RLUIPA claims, and they have filed a cross-motion
for summary judgment on Claims 3 and 8.


a.   Religious Supply Catalogs (Claim 8)

The DOC mail policy challenged in Claim 8 states, in
pertinent part:

> Bulk mail that advertises or solicits any item or service
> that inmates are not authorized to receive will not be
> forwarded to the inmates but will be removed from the
> institution and destroyed.  Mail order catalogs of popular
> vendors will be available for use in the library.  The
> Warden can make exceptions to this policy.

PPD 5.26 ¶ IV(E)(5) (Doc. No. 12-5, at 5).  It is undisputed
that the policy, as applied, has prevented Czekalski from
receiving religious supply catalogs through the mail.  See Hanks
Decl. ¶ 31 (Doc. No. 81-6, at 9) ("By NHDOC policy, the inmate
mail service will not accept bulk mail supply catalogs.").

Czekalski claims that the practice at issue violates RLUIPA
by preventing him from receiving catalogs of religious books and
other religious supplies, without which he cannot know what
books or other religious items are available for him to
purchase.  Czekalski acknowledges that the NHSP Chapel library

has a few catalogs that are available to him, but they are out-
of-date and several years old and list books that are out-of-
print.  Czekalski Decl. I, at 4 (Doc. No. 68-1).  Czekalski does
not identify in the record, however, any specific book or
periodical that he has sought but been unable to locate, or any
topic of interest or importance to his religious practice that
he was unable to pursue, due specifically to the DOC's
disallowance of bulk mail catalogs.

Pursuant to DOC policy, a DOC chaplain's position entails,
among other things, "assist[ing] inmates with obtaining
religious books and periodicals."  Daly Decl. II ¶ 7, at 2 (Doc.
No. 81-5 at 2) (citing PPD 7.17(V)(G)(1)).  Consistent with that
policy, Chaplain Daly has averred that he is, and has been
during Czekalski's incarceration at the NHSP, able and willing
to assist Czekalski in obtaining religious books; Chaplain Daly
counts, as part of his job, "assisting in the acquisition of
religious books and periodicals, downloading, as necessary, book
and periodical catalogs, and communicating with publishers and
distributors to ensure, as necessary, that inmate requests are
met," as well as making sure that "books and magazine dimensions
conform to DOC regulations."  Daly Decl. II ¶ 8 (Doc. No. 81-5
at 2).

It is undisputed that Czekalski has never asked Chaplain
Daly to assist him in obtaining religious books or periodicals,

or downloading religious goods catalogs.  Czekalski explains

that Chaplain Daly "is not qualified to assist [him] in [his]

religious learning" because he is a Christian, and because

"[t]here are too many conflicts and too many differences between

the religions."  2019 Czekalski Dep., at 50 (Doc. No. 81-2, at

12).  Czekalski further cites Chaplain Daly's "open indifference

and/or hostility toward Non-Catholics" as a basis for his claim

that Chaplain Daly cannot adequately conduct a search for Jewish

religious materials or catalogs of such materials.  Pl.'s Reply

(Doc. No. 85-1, at 2).  In his deposition, Czekalski testified

as follows:

> DEFENDANTS' COUNSEL:  What, if any, effort have
> you made to enlist the aid of Chaplain Daly in
> ordering books or religious property through catalogs?
>
> CZEKALSKI:  Minimal, mostly because I am made to
> feel unwelcome in his presence.
>
> Q:  When you say "minimal," you mean never,
> right?
>
> A:  Never.  I think I might have received help on
> Passover Matzoh once or twice, but that would be about
> it.
>
> . . .
>
> Q:  Why do you feel unwelcome in his presence?
>
> A:  He just gives off a vibe that if you're not
> Christian, or particularly, his type of Christian, he
> really doesn't want to deal with you.

2019 Czekalski Dep., at 125 (Doc. No. 85-4, at 11).

Czekalski also states that he is not the only non-Christian inmate who has had difficulty ordering religious books. Czekalski Decl. I (Doc. No. 68-1, at 5).  Another inmate, a Wiccan, ordered religious materials from a vendor in June 2019, using information provided by Chaplain Daly; the vendor returned the inmate's check in July 2019, stating that the items were discontinued.  Decl. of Wayne Benware, Nov. 6, 2019 (Doc. No. 68-2, at 9).  That inmate has found Chaplain Daly to be "unfriendly and unhelpful" to non-Christian inmates.  Doc. No. 68-2, at 9.

In his pleadings (Doc. No. 1), Czekalski stated that "the only way [he] can order books or religious property is through [religious supply] catalogs as he has no one on the outside to assist him."  Compl. ¶ 87 (Doc. No. 1).  There is evidence, however, that Czekalski has obtained information about religious books and periodicals from Rabbi Nafshi, see, e.g., Nafshi Ltr. (Doc. No. 68-1, at 11) (providing information about how to subscribe to the Jerusalem Post Ivrit, a periodical). Additionally, Chaplain Daly maintains the NHSP Chapel library, which has "Jewish books" available to be viewed and signed out by Jewish inmates upon request.  Daly Decl. II ¶¶ 17, 19 (Doc. No. 81-5 at 5).  Czekalski has made use of the NHSP Chapel library to borrow books relating to his religion.

Czekalski has failed to demonstrate, by any submission of evidentiary quality, that his religious practice is or has been "substantially burdened" by the DOC's prohibition on bulk mail catalogs, as applied in his circumstances.  Neither the evidence, construed in a light most favorably to plaintiff, that Chaplain Daly has at times expressed a bias against non-Catholics, nor Czekalski's speculation that Chaplain Daly would not or could not help him obtain what he needed because he is a Catholic deacon, is evidence that asking Chaplain Daly for assistance in procuring books and catalogs specific to his religious practice and interests would be fruitless.  Also, Czekalski can seek assistance from Rabbi Nafshi who, as a religious visitor, can send him printouts or photocopied pages of catalogs for the types of materials Czekalski wants.  As Czekalski has not explained how the inability to receive catalogs in the mail has actually burdened his religious practice, or stated with specificity what materials he has not been able to access as a result of the bulk mail policy, he has failed to show that his religious practice is substantially burdened.  Even if the receipt of such catalogs through the mail would make his religious practice easier, a "[s]ubstantial burden requires something more than an incidental effect on religious exercise" or inconvenience.  Signs for Jesus v. Town of Pembroke, 977 F.3d 93, 111 (1st Cir. 2020) (internal

quotation marks omitted) (citing Midrash Sephardi, Inc. v. Town
of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004)).

Czekalski has failed to meet his burden to demonstrate that
his religious exercise is substantially burdened by the DOC's
bulk mail catalog policy, and he has failed to show that there
is any genuine issue of material fact as to that element of his
RLUIPA claim, with respect to Claim 8.  Accordingly, defendants'
motion for summary judgment (Doc. No. 81) on Claim 8 is granted,
and plaintiff's motion is denied (Doc. No. 68), to the same
extent.


b.   Book Size Limit (Claim 3(a))

Plaintiff has claimed that the limits on the dimensions of
books and magazines in his cell substantially burdens his
religious self-study relating to Jewry, Judaism, and Israel.  As
evidence of that burden, he offers his sworn statement that he
once owned a book containing pictures of Israel that exceeded
the book size limit, which he gave to Rabbi Nafshi, and that
there are other (unspecified) books relating to his religion he
would want in the future, which may be oversized.

Evidence including Czekalski's prior ownership of an
oversized book (given to Rabbi Nafshi who visits him
periodically and has donated books to the Chapel library in the
past) does not provide a basis for a reasonable jury to find

that the book size limit puts pressure on Czekalski to modify his self-study practices and alter his beliefs, or otherwise imposes a substantial burden in violation of RLUIPA.  Without any evidence suggesting that there are areas of religious study he cannot pursue or specific oversized books he needs that are unavailable in a permissible size, plaintiff has not carried his burden of showing that the book size limit imposes a substantial burden, or that there is a genuine issue of material fact on that issue.  Accordingly, plaintiff's motion for summary judgment on Claim 3(a) is denied, and defendants' motion for summary judgment on that claim is granted.

c.   Book Quantity (Claim 3(b))

Plaintiff has also claimed that the prison's prohibition on keeping more than eleven books and magazines in his cell imposes a substantial burden on his religious practices, in violation of his rights under RLUIPA.  Commissioner Hanks's declaration describes the policy as follows:

> [PPD 9.02] provides that inmates can have no more than eleven (11) books . . . or magazines . . . plus an electronic tablet, in their cells.  If an inmate should exceed that limit – thereby generating unauthorized property – but nonetheless wishes to retain access, he may rotate old texts for new ones – that is, by mailing the additional items outside the facility to a designated individual or donating them to the Prison or Chapel libraries.

Hanks Decl. ¶ 23 (Doc. No. 81-6, at 7-8) (emphasis in original).

Czekalski has explained in a declaration that he needs access to a number of books in his cell each day to engage in his religious studies.  His list of more than twelve books he states he needs to study his religion is not further characterized by the evidence as a list of books his practices require him to read every day.  That list includes titles suggesting overlapping subject matter in some cases (several dictionaries and lexicons of Biblical Hebrew, for example); some books he says will donate to the Chapel library when he is finished with them; and his acknowledgement that he has kept three non-religious books in his cell that count towards the eleven-book maximum.  See Czekalski Decl. III (Doc. No. 85-2, at 4).  Czekalski further avers that he has plans to follow a practice of reading about a page a day of the Talmud, which he estimates will require him to purchase a new volume approximately once every five weeks; his declaration clarifies that following that practice will require him to keep one or two volumes in his cell at a time (the one currently being read, and the next in sequence), which he plans to donate to the Chapel library when he is done.  See Czekalski Decl. III (Doc. No. 85-2, at 4-5).

To the extent Czekalski needs access on a given day to a different text than the eleven he is allowed to keep in his cell

at that time, the evidence shows he can make arrangements to
acquire new texts by donating an equal number to the NHSP Chapel
library or by giving them to someone outside, like Rabbi Nafshi,
and then buying or borrowing new ones.  Czekalski has conformed
to the rule's limits in the past by surrendering or donating
non-conforming books, although he has had concerns about losing
access to donated books because of the lack of adequate secured
storage in the library, and the risk he will be transferred.
See Czekalski Decl. III (Doc. No. 85-2, at 4-5).  With regard to
those considerations, Czekalski has averred that he "cannot
depend on the Chapel library and must be allowed to own the
necessary books as personal property."  Czekalski Decl. I (Doc.
No. 68-1, at 1).  It is undisputed, however, that arrangements
have been made for the acquisition of another cabinet to keep
books reserved for Jewish inmates securely locked in the Chapel
when not in use.  Daly Decl. II ¶ 18 (Doc. No. 81-5, at 5).  And
absent evidence of any impending transfer, Czekalski's concerns
in that regard are speculative.

     "The prison must permit a reasonable opportunity for an
inmate to engage in religious activities but need not provide
unlimited opportunities."  Van Wyhe v. Reisch, 581 F.3d 639, 657
(8th Cir. 2009).  The prison policy at issue (including its
complete lack of a page-length restriction) provides Czekalski
with a reasonable opportunity to acquire books and study his

religion each day, keeping in his cell at any given time a
subset of all of the titles he lists as books he needs.  It
requires speculation unwarranted by the evidence before me to
conclude that Czekalski needs access in his cell to more than
eleven of those books each day to meet his religious
requirements, when he has the option of donating and borrowing
books from the Chapel library.  Compare id. at 657-58 (no
substantial burden where inmate was not permitted to have in-
cell tape player to learn Hebrew, but had access to tape player
outside his cell and was permitted to study Hebrew books in his
cell), with Washington, 497 F.3d at 281 (substantial burden was
established where inmate's religion required him to read four
religious books per day but prison policy allowed him to possess
only ten at any time).  See also Gordon v. Mullins, No. 7:12-cv-
00494, 2014 WL 1118199, at *4, 2014 U.S. Dist. LEXIS 37639, at
*19-20 (W.D. Va. Mar. 20, 2014) (thirteen-book limit on books
that inmate could keep in cell, enforced by officers'
confiscation of excess religious books, may have made it "more
inconvenient, difficult, and expensive for [inmate] to learn,
understand, and practice" his religion, but this did not amount
to substantial burden, where defendants did not limit inmate's
ability to acquire books from another source, so long as he
relinquished an equal number), aff'd, 582 F. App'x 248 (4th Cir.
2014).  No reasonable jury could conclude that the requirement

of keeping no more than eleven books in his cell at a time,
coupled with the option of donating and obtaining new books from
the Chapel library, imposes a substantial burden under RLUIPA.
Accordingly, I deny plaintiff's motion for summary judgment on
Claim 3(b) and grant defendants' motion on that same claim.


###### 5.   Cell Feeds (Claims 4(a) and 4(c))

In Claims 4(a) and 4(c), Czekalski claims that defendants'
refusal to provide him with cell feeds every morning and during
his Shabbat observance imposes a substantial burden on those
religious exercises because he has had to make a meal for
himself from food he purchases from the commissary.  The
availability of commissary food is an alternative to chow hall
meals that the prison already provides.  If, however, an inmate
is indigent and cannot afford to pay his own meal expenses,
prison authorities may be required to deliver meals to an inmate
as a further accommodation for his religious observances.  Cf.
Combs v. Washington, No. C12-5280 RBL, 2014 WL 4293960, at *22,
2014 U.S. Dist. LEXIS 121320, at *57-58 (W.D. Wash. June 11,
2014) (absent evidence of inmate's indigence, inmate's choice to
eat food in his cell on his Sabbath that he purchased from
commissary did not support a finding of substantial burden), R&R
approved, 2014 WL 4293960, 2014 U.S. Dist. LEXIS 121314 (W.D.
Wash. Aug. 29, 2014), aff'd, 660 F. App'x 515 (9th Cir. 2016).

This court's records show that Czekalski filed three civil rights cases in the District of New Hampshire since November 2017.  He has paid the $400.00 filing fee upfront in each, including most recently, a filing fee paid on February 4, 2019. He had approximately $1,500.00 in savings in January 2020, see Dep. of Jason Czekalski, Jan. 15, 2020 ("2020 Czekalski Dep."), at 18 (Doc. No. 85-4, at 34).  Since April 2020, however, the Department of Veterans Affairs has been garnishing all of the monthly disability benefits he had been receiving, for an overpayment that is likely to take the agency approximately twenty years to recoup, see Doc. No. 86, at 3.  While no reasonable jury could find in favor of Czekalski on the issue of whether his current financial status amounts to indigence, there is at least a jury question on whether receiving no cell feeds amounts to the imposition of a substantial burden on his religious practices, where the cost of the food he buys outstrips his income, other inmates receive meals without cost, and there are other expenses a jury could find Czekalski will likely incur, which will reduce his savings if he cannot defer them.  See Jones v. Carter, 915 F.3d 1147, 1151 (7th Cir. 2019) (where inmate "testified to his meager sources of income, and the state has confirmed that the cost to [the inmate] of subsidizing his own religiously compelled diet would systematically outpace his reliable income," substantial burden

was properly found).  Accordingly, I deny both parties' cross-motions for summary judgment the issue of substantial burden as to Claim 4(a).

Similarly, there is a genuine issue of material fact on the issue of whether defendants continue to be responsible for denying Czekalski the opportunity to receive cell feeds during his Shabbat hours.  Such a denial, if it were established, could amount to the imposition of an additional burden on Czekalski.  Therefore, the cross-motions for summary judgment, concerning Claims 4(a) and 4(c), are denied with respect to the issue of whether Czekalski's religious practices are substantially burdened.

As to whether there is any compelling interest served by denying Czekalski cell feeds each morning and during his Sabbath travel restriction, and whether that policy is the least restrictive means of advancing a compelling interest, Czekalski points to the array of circumstances in which cell feeds are provided regularly or intermittently to inmates in his unit.  Meals are delivered to cells to accommodate inmate observances of multi-day fasts like Ramadan.  Defendants have not provided any evidence upon which a reasonable jury could find in their favor on the elements of compelling interest and least restrictive means.

Accordingly, I rule on the cross-motions for summary judgment (Doc. Nos. 68, 81) on an element-by-element basis, with respect to Claims 4(a) and 4(c).  As there remains a genuine dispute of material fact regarding the existence of a government-imposed substantial burden relating to Czekalski's morning prayers and Sabbath observance, I deny both parties' motions on that issue with respect to Claims 4(a) and 4(c).  But as defendants have not effectively countered plaintiff's demonstration of the absence of evidence to support findings favoring defendants on the elements of compelling interest and least restrictive means (Doc. No. 68), I grant Czekalski's motion on those elements and deny defendants' motion (Doc. No. 81) on those same elements, as to Claims 4(a) and 4(c).

### 6.   Head Covering (Claims 6(a)-(b), 7(a)(i)-(ii))

Czekalski argues in Claim 6 and Claim 7(a) that the prison's clothing rules, as applied, violate RLUIPA and the First Amendment Free Exercise Clause, as they do not allow him to wear a hat that stays on his head both inside and outside, as his religious practice requires.  Those rules state, in pertinent part, "hats are not to be worn inside."  See NHSP Manual for the Guidance of Inmates at 9 (Doc. No. 11-9, at 2).  The no-hats-inside rule does not apply, however, to yarmulkes worn by Jewish inmates.  See Hanks Decl. ¶ 28 (Doc. No. 81-6, at

9); see also DOC Faith Group Overview (listing "yarmulke (skull cap)" as allowable personal item for Jewish inmates) (Doc. No. 11-2, at 11).  Czekalski claims in this case that: (1) his religious practice requires him to cover his head everywhere; (2) because a yarmulke does not stay on his head outside, he chooses to wear a knit cap both inside and outside as a head covering; and (3) he has been told by some corrections officers that he has to choose between wearing a knit cap or a yarmulke and cannot carry both at the same time.

### a.   Indoors (Claims 6(a) and 7(a)(i))

Defendants point to undisputed evidence that they have already accommodated Jewish inmates' head covering practices by excepting yarmulkes from the no-hats-inside rule.  Czekalski's religion allows him to wear a yarmulke as a religious head-covering, and he has testified that if he were required to wear only a yarmulke inside, he would not be violating any tradition or tenet of Judaism.  2019 Czekalski Dep. at 112 (Doc. No. 85-4).  Czekalski has worn a yarmulke in court proceedings in the courthouse in this case, and there is no suggestion in the record that he cannot effectively cover his head inside by wearing a yarmulke.  Czekalski has thus failed to show that his religious exercise of wearing a religious head covering indoors

has been substantially burdened by any prison policy enforced by defendants.

Accordingly, I deny Czekalski's motion for summary judgment on Claim 6(a), and I grant defendants' motion for summary judgment on Claims 6(a) and 7(a)(i), the related Free Exercise Clause claim that also requires proof of a substantial burden. See Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 101 (1st Cir. 2013) ("[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden" (internal quotation marks and citations omitted)).

### b.   Outdoors (Claims 6(b) and 7(a)(ii))

Czekalski challenges as a violation of RLUIPA and the Free Exercise Clause the "harassment" he claims he has experienced, when guards have told him he cannot carry both a yarmulke and a hat and must choose one or the other.  The court has liberally construed such allegations as stating a separate RLUIPA claim identified as Claim 6(b), and a related First Amendment religious freedom claim, identified in this Order as Claim 7(a)(ii), regarding the impact of those guards' remarks on Czekalski's practice of keeping his head covered inside and outside.

Defendants point to the undisputed evidence that the prison's written no-hats-inside policy applies only to the indoor wearing of hats that are not approved as religious head coverings; there is no prison rule against wearing the type of knit cap Czekalski wants to wear outdoors.  Defendants also point to Czekalski's testimony that there is no written prison policy, or tenet or tradition in Judaism, that prevents him from wearing a yarmulke under a knit cap outdoors.

Czekalski's testimony regarding what some guards have told him, about having to choose between a cap and a yarmulke, does not amount to evidence that his religious practice of covering his head has been subjected to any substantial burden or coercive pressure by defendants in this case.  There is no suggestion that Czekalski has been written up for wearing a yarmulke, a hat, or both outside, and there is also no evidence that those incidents where guards have told him he cannot carry both a hat and a yarmulke have happened more often than sporadically.  See Ealom v. United States, No. 18-3045-SAC, 2018 WL 1899135, at *4, 2018 U.S. Dist. LEXIS 66792, at *8-9 (D. Kan. Apr. 20, 2018) (allegations that guards harassed detainee for wearing a religious head wrap, "threatened her with a disciplinary violation, and at least once forced her to make a choice between removing the head covering and receiving her prescribed medication," appeared to be only sporadic incidents,

which did not substantially burden detainee's religious
beliefs).  Cf. Bridges v. Dart, 950 F.3d 476, 479 (7th Cir.
2020) (to demonstrate that unlawful practice amounted to policy,
"there must be some evidence demonstrating that there is a
policy at issue rather than a random event or even a short
series of random events").

The record before me does not suggest a reasonable basis
for a jury to find that Czekalski's religious exercise of
covering his head has been substantially burdened by any policy
or practice attributable to defendants.  Defendants' motion for
summary judgment (Doc. No. 81) is therefore granted with respect
to both Claim 6(b) and 7(a)(ii), and Czekalski's cross-motion
for summary judgment on his RLUIPA claims is denied to the
extent it seeks such relief on Claim 6(b).

### E.   Remaining Claims (Claims 2(e)-(h))

The last set of claims in this case relate to the prison
policies that limited Czekalski's contacts with Rabbi Nafshi
prior to November 2018, when she was classified as a religious
volunteer (Claims 2(e)-(h)).  Czekalski has contended here that
the restrictions summarized in Claims 2(e)-(h) have violated his
rights under the First Amendment's Free Exercise Clause, giving
rise to defendants' liability under 42 U.S.C. § 1983.
Defendants have moved for summary judgment on those claims.

1.   Free Exercise Clause and *Turner*

Inmates retain the protections afforded by the Free Exercise Clause, "'including its directive that no law shall prohibit the free exercise of religion.'"   Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir. 2008) (citation omitted).   "[T]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden."   Roman Cath. Bishop, 724 F.3d at 101 (internal quotation marks and citations omitted).

Prison policies that impinge on inmates' First Amendment rights, including their religious freedom rights, are valid if the restraints imposed by such policies are reasonably related to legitimate government objectives and are not excessive in relation to those objectives.   See Bell v. Wolfish, 441 U.S. 520, 538-40 & n.20 (1979); see also Turner, 482 U.S. at 89; Yahtues, 2020 WL 1492877, at *10, 2020 U.S. Dist. LEXIS 53254, at *30.   Courts evaluating such prison policies must do so with due deference to the professional expertise and judgment of corrections officials on issues of institutional safety, security, and order.   See Pell v. Procunier, 417 U.S. 817, 827 (1974); see also Turner, 482 U.S. at 89.   The factors relevant

to that inquiry, known as the "Turner factors," specifically
include:

> "(1) whether there is a valid, rational connection between
> the regulation and the legitimate government interest put
> forward to justify it; (2) whether alternative means to
> exercise the right exist; (3) the impact that accommodating
> the right will have on prison resources; and (4) the
> absence of alternatives to the prison regulation."

LeBaron, 527 F. App'x at 31-32 (quoting Kuperman, 645 F.3d at
74).  The burden "is not on the State to prove the validity of
prison regulations but on the prisoner to disprove it."  Overton
v. Bazzetta, 539 U.S. 126, 132 (2003).

### 2.   Claims 2(e) and 2(f)

The policies that restricted Rabbi Nafshi's contacts with
Czekalski when she was a religious volunteer included those at
issue in Claims 2(e) and 2(f):

- The policy that generally prohibits religious
  volunteers from corresponding with inmates by mail,
  see PPD 2.24 ¶ IV(D)(9)(g), IV(D)(12)-(13) (Doc. No.
  11-6, at 4-5) (volunteers may not correspond with
  inmates without authorization of their staff
  supervisor); and

- The policy that generally prohibits religious
  volunteers from helping inmates acquire books,
  property, and special foods (Claim 2(f)), see PPD 7.17
  ¶ IV(H) (Doc. No. 11-2, at 3) (volunteers may not
  "conduct business of any type for/with inmates"); PPD
  2.24 ¶¶ IV(A)(3)-(4), IV(C)(1)-(2) (Doc. No. 11-6, at
  2-3) (volunteers may not give or sell items to inmates
  without permission of the Commissioner).

Citing the Turner test as grounds for granting their motion for summary judgment on those claims, defendants have pointed to their legitimate institutional security interest in avoiding volunteers' undue familiarity with inmates as the rationale for those rules, which plaintiff has not disputed. See Stip. I ¶ 10 (Doc. No. 31, at 4) (such proscriptions, "aimed at deterring 'undue familiarity' between inmates, on the one hand, and staff and volunteers, on the other, advance the legitimate penological interest of maintaining institutional security"). See generally Moorehead v. Keller, 845 F. Supp. 2d 689, 691-93 (W.D.N.C. 2012) (policy prohibiting correspondence with volunteers, characterized by inmate as his "'spiritual advisors,'" was reasonably related to legitimate penological interest of deterring undue familiarity). There is no genuine issue of material fact on that factor, which weighs in favor of finding the rules to be valid.

With respect to the second Turner factor, the record here provides a number of examples of alternate means available to Czekalski for exercising the same or substantially similar religious practices involving his contacts with Rabbi Nafshi at issue in Claims 2(e) and 2(f) when Rabbi Nafshi was a religious volunteer. Those alternatives included in-person meetings with Rabbi Nafshi in the Chapel prior to June 2018, self-study using books in his cell or in the Chapel library, participation in

group activities coordinated by the other Jewish religious
volunteer, and working with the chaplain to obtain religious
items, as a substitute for obtaining items with the Rabbi's
assistance.  No reasonable jury could conclude from the record
that adequate alternatives were unavailable to Czekalski to
accommodate his religious practices for the period of time at
issue in Claims 2(e) and 2(f).

As to the third and fourth Turner factors, Commissioner
Hanks has explained that the restrictions are the least
restrictive means of advancing that interest.  "[A]bridging any
one" of the restrictions at issue would sow undue familiarity
among volunteers and inmates, potentially compromising
institutional security.  Hanks Decl. ¶ 4 (Doc. No. 81-6, at 2).
The court defers to Commissioner Hanks's statements with respect
to Claims 2(e) and 2(f), as they reflect her professional
judgment about prison security.  See Kuperman, 645 F.3d at 74.

Plaintiff argues that correspondence from Rabbi Nafshi
could have been screened only for contraband, and not restricted
altogether.  But he offers no evidence that the risk of undue
familiarity that the restrictions are designed to address would
have been served by routine screenings for contraband, without
any substantial impact on security resources that could be
required to respond to the resulting risks of undue familiarity
developing between the volunteer and inmates.

Plaintiff further contends that defendants' past practices provide an alternative to applying the restrictions at issue in Claims 2(e) and 2(f) to his contacts with Rabbi Nafshi when she was a religious volunteer.  There is, however, no evidence of any variation in the manner in which those specific rules were applied over time, which could provide an example of an alternative to the restrictions at issue in Claims 2(e) and (f). Furthermore, a change in the manner in which those policies had been enforced over time would not drive a finding that the restrictions were not reasonably related to a legitimate penological purpose.  See Chance v. Tex. Dep't of Crim. Just., 730 F.3d 404, 411-12 (5th Cir. 2013) ("the mere existence of a prison policy that differs from a past policy or another institution's policy does not necessarily entitle a plaintiff to survive summary judgment on his RLUIPA claim").

Each of the Turner factors upon which there is evidence weighs in favor of defendants, with respect to the restrictions at issue in Claims 2(e) and 2(f).  Accordingly, defendants' motion for summary judgment on those claims is granted.

### 3.   Claim 2(g)

In Claim 2(g), Czekalski raises a Free Exercise Clause challenge to Chaplain Daly's role in preventing Rabbi Nafshi from distributing written religious materials she chose to her

meetings with Czekalski when she was a religious volunteer prior
to November 2018.  In his pleadings and in the proposed order
filed with the original complaint, see Doc. No. 1, at 5-6; Doc.
No. 1-1, at 1), Czekalski objects to the policy that prevented
Rabbi Nafshi from continuing to bring large volumes of written
materials to her visits with inmates, without prior review.

The formal policies underlying Chaplain Daly's review of
such materials are summarized in an April 21, 2017 email to
Rabbi Nafshi:

> I informed [Rabbi Nafshi], then a religious "volunteer," of
> the requirements of PPD 5.26 . . . that as to such articles
> and Internet printouts as she or an inmate might wish to
> discuss on visits, "[t]en double sided pages is the maximum
> number of pages that can be received by inmates.  Any
> material you intend to allow them to review must be dropped
> off at the Mail Room during business hours 0800-1500 hrs.
> I will review the material and then bring it to the
> Chapel."

Daly Decl. II ¶ 9 (Doc. No. 81-5, at 2).  See also PPD 5.26
¶ IV(D)(2)(a), (E)(2) (allowing articles, Internet printouts,
and photocopies to be sent to inmates through Mailroom if those
materials are comprised of less than ten pages) (Doc. No. 12-5,
at 9).  PPD 7.09 ¶ IV(N)(1)(c)(4) (Doc. No. 12-3) further
provides that visiting clergy planning to use written religious
materials must submit those materials to the chaplain for prior
review, and if the chaplain approves, the chaplain will make
those materials available for use.

74

a.   Ten-Page Limit

The ten-page limit passes scrutiny under Turner.  First, the policy is rationally related to the prison's interest in ensuring that incoming packages of written materials can be effectively pre-screened for contraband, which can include small items folded in between pages and illicit drugs transmitted through powders and liquids that can appear as ink or stains on a page, see Hanks Decl. ¶ 5 (Doc. No. 81-6, at 2); Fouts Decl. ¶ 16 (Doc. No. 75-1, at 4).  The fewer the number of pages that must be screened, the less the chance that contraband will enter the prison environment through those pages.

Second, there are alternative ways an inmate like Czekalski could exercise his rights affected by the page-limit on religious volunteer materials, including asking the volunteer to bring fewer materials in each time, spreading out a large volume of pages over multiple visits, acquiring the materials at issue directly from the publisher, using materials already in the Chapel library's collection, or discussing topics raised in new materials without sharing them in written form during a clergy visit.  No reasonable jury could find an absence of adequate alternatives upon the undisputed evidence in the record.

As to the third and fourth factors, Czekalski has offered the alternative of simply allowing Rabbi Nafshi to bring in large volumes of papers without prescreening, as the evidence

suggests she did for many years without incident.  But that alternative does not meet the legitimate penological purposes served by the ten-page limit, that is, reducing the ways in which contraband can enter the facility through inadvertence, without imposing extra resource demands on the prison's security staff.  Commissioner Hanks's declaration makes it clear that the screening function is labor-intensive and time-consuming; each incremental addition of pages that must be screened increases the risk of error and imposes a drain on already scarce time and staff resources available for the important security-related task.  See Hanks Decl. ¶¶ 5, 31 (Doc. No. 81-6, at 2, 9).  This court must defer to the prison officials' decision in that regard.  No ready alternative to a content-neutral page-limit appears available given the evidence in the record.

All of the Turner factors weigh in favor of finding the ten-page limit on religious materials to be reasonably related to a legitimate security purpose, based on the undisputed facts before me.  See Lewis v. Clark, 663 F. App'x 697, 702 (10th Cir. 2016) (prison's ten-page limit on incoming mail upheld under Turner, in case presenting First Amendment free speech and association claims).  Accordingly, I grant defendants' motion for summary judgment on the ten-page limit at issue in Claim 2(g).

b.   Content Screen

Defendants move for summary judgment on the Free Exercise Clause claim challenging the screening Chaplain Daly is alleged to have applied to written religious materials selected by Rabbi Nafshi for use with inmates.  Citing cases indicating that sporadic or isolated acts burdening a religious practice will not be deemed to impose a substantial burden, see, e.g., Mubashir v. Moore, No. 3:10 CV 2802, 2011 WL 1496670, at *6, 2011 U.S. Dist. LEXIS 42130, at *18 (N.D. Ohio Apr. 19, 2011) (denial of services in Chapel on two occasions amounted to isolated instances that did not violate inmate's First Amendment rights (citing cases)), defendants contend that Czekalski's loss of use of materials, attributable to Chaplain Daly's conduct, did not substantially burden Czekalski's religious exercise.

Viewed in a light most favorable to plaintiff, there is evidence of one incident in 2018 when Chaplain Daly reviewed and then questioned the content of materials Rabbi Nafshi had selected: specifically, the 67-page packet of materials she planned to provide to Bader and Czekalski in May 2018.  There is no evidence, however, that Chaplain Daly (the sole defendant remaining on Claim 2(g)) took any similar action resulting in Czekalski's loss of access to any other written materials on any other date.

Rabbi Nafshi testified in her deposition that those materials included print-outs regarding "Israeli history, or Israeli military history, or Jewish identity questions, which for many Jews goes to the heart of their identity as Jews." Rabbi Nafshi Dep. at 22, 24-25 (Doc. No. 85-4, at 43).  The record does not suggest, however, that Rabbi Nafshi was unable to discuss those matters with the inmates on that date, lacking access to those specific documents.  Absent any evidence that Czekalski's loss of access to those specific written materials on that single occasion placed more than an incidental burden on his religious exercise of meeting with Rabbi Nafshi, the screening at issue in Claim 2(g) did not violate Czekalski's free exercise rights.  See Signs for Jesus, 977 F.3d at 111 (substantial burden requires more than inconvenience or incidental effect on religious exercise).  Finding no triable issue in the record before me on that question, I grant defendants' motion for summary judgment on Claim 2(g).

### 4.   Qualified Immunity on Claim 2(h)

Defendants invoke qualified immunity as grounds for their motion seeking summary judgment on Claim 2(h), which concerns Rabbi Nafshi's June 1 decision to cease visiting inmates at the NHSP.  Defendants' motion for summary judgment on that claim succeeds.

The question relevant for the qualified immunity analysis relating to Claim 2(h) is contextual, taking into account evidence of Rabbi Nafshi's voluntary engagement and cessation of her role as a religious volunteer:  Would a reasonable prison official have been aware of a First Amendment free exercise problem, when a religious volunteer initiates a break in regular visits with an inmate lasting approximately six months, after the chaplain notified her of his concerns relating to the materials the volunteer planned to use with inmates and the chaplain's conclusion that she had been manipulated by inmates seeking to circumvent prison rules.

The court is satisfied that there is no clearly established law, manifested in any controlling case or in a robust consensus of persuasive authority from other jurisdictions, regarding the First Amendment free exercise issues presented as to Claim 2(h), sufficient to overcome defendants' invocation of their qualified immunity defense, given Rabbi Nafshi's voluntary actions in this context.  Cf. Bader II, 675 F.3d at 99 (no RLUIPA violation had been shown where prison transfer that negatively impacted inmate's access to group worship and counseling depended proximately on decisions and actions of potential religious volunteers and were not attributable to prison transfer). Accordingly, defendants' summary judgment motion is granted as to Claim 2(h).

## IV.   **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (Doc. No. 81) and Czekalski's (first) motion for partial summary judgment (Doc. No. 68) are both granted in part and denied in part, and Czekalski's second motion for partial summary judgment (Doc. No. 69) is denied.  The parties are directed to file joint or separate proposed revisions to the pretrial schedule by January 7, 2021, and the clerk's office is directed to schedule a case management conference with the parties by telephone or video conference thereafter, at which those proposed revisions will be discussed.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

December 8, 2020

cc:   Jason Czekalski, pro se
      Seth M. Zoracki, Esq.